**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **LATIKA KAKU and HIRENDRAKUMAR KAKU,**<br>**Plaintiffs,**<br><br>**v.**<br><br>**REGAL ENTERTAINMENT GROUP, REGAL CINEMA, ASHLEY MANSFIELD, GARY DAILEY, JOHN DOE 1-3,**<br>**Defendants.** | **CIVIL ACTION**<br><br>**NO. 25-497** |

**MEMORANDUM**

**HODGE, J.** **August 14, 2026**

Plaintiffs Latika Kaku ("Ms. Kaku") and Hirendrakumar Kaku ("Mr. Kaku") bring this premises liability action against Defendants Regal Entertainment Group, Regal Cinemas, Inc. (collectively "Regal"), and Gary Dailey ("Dailey") (together with Regal, "Defendants"). The action arises from Ms. Kaku's trip and fall on the stairs while exiting the IMAX auditorium at the Regal Downington movie theater ("Regal Downington") in December 2022. Before the Court are Defendants' Motion for Summary Judgment (ECF No. 15), Plaintiffs' Response in Opposition (ECF No. 20), and Defendants' Response in Support (ECF No. 22).

Also before the Court are Defendants' Motion to Preclude Opinions of Plaintiffs' Expert, David Littlewood (ECF No. 16 ("Motion to Exclude")), Plaintiffs' Response in Opposition (ECF No. 17), Defendants' Response in Support of the Motion (ECF No. 18), Plaintiffs' Motion for Leave to File Surreply Regarding Defendants' Motion to Exclude (ECF No. 19), Defendants' Response in Opposition to the Motion for Leave to File Surreply (ECF No. 21), and Plaintiffs' Response in Support of the Motion for Leave to File Surreply (ECF No. 23).

For the reasons stated below, the Court grants Defendants' Motion to Exclude and Motion for Summary Judgment.

## I. BACKGROUND[1]

### A. Factual Background

The following facts are either undisputed, as reflected in the parties' respective statements of material facts and responses thereto (ECF No. 15 at 5–10 (Defendants' Statement of Undisputed Material Facts ("Defs.' SMF")); ECF No. 20; ECF No. 22 at 10–14 (Defendants' Response to Plaintiffs' Statement of Additional Material Facts ("Defs.' Response to SAMF"))), or are otherwise supported by the record, as cited by the parties in accordance with Federal Rule of Civil Procedure 56(c)(1).

On December 27, 2022, Ms. Kaku attended an evening showing of Avatar 2 at the Regal Downington theater. (Defs.' SMF ¶¶ 1, 3; ECF No. 20 ¶¶ 1, 3.) Ms. Kaku and her companions—her husband Mr. Kaku, daughter, two friends, and two children of the friends—all ascended the stairs to their seats in the IMAX auditorium without issue at the beginning of the showing. (Defs.' SMF ¶¶ 3–5; ECF No. 20 ¶¶ 3–5.) Ms. Kaku did not notice anyone else in the theater have an issue ascending or descending the stairs that night. (Defs.' SMF ¶ 6; ECF No. 20 ¶ 6.) In total, 406 people attended three showings at the Regal Downington IMAX auditorium that day, which is an average number of customers to attend this Regal IMAX. (Defs.' SMF ¶¶ 38–39; ECF No. 20 ¶¶ 38–39.)

After the movie ended, Ms. Kaku attempted to exit the IMAX auditorium via the same stairs she ascended at the beginning of the showing. (Defs.' SMF ¶¶ 3, 7–8; ECF No. 20 ¶¶ 3, 7–8.) Ms. Kaku testified that she was holding on to the railing, did not have anything in her hands,

[1] The Court adopts the pagination supplied by the CM/ECF docketing system.

was wearing sneakers and her glasses, and had not consumed any alcohol or drugs that would affect her walking. (ECF No. 20 ¶¶ 57–58; Defs.' Response to SAMF ¶¶ 57–58.) She further testified that while walking down the stairs, her right foot "got caught on the . . . rubber end of the stair. And it twisted, and [she] fell there." (ECF No. 20-4 at 4; *see also* Defs.' SMF ¶ 2; ECF No. 20 ¶ 2.) After she fell, Ms. Kaku sat on the landing at Row D, which her sworn affidavit states is the landing directly above the stair where her foot was caught. (ECF No. 20 ¶¶ 60, 65; Defs.' Response to SAMF ¶¶ 60, 65.) Ms. Kaku's affidavit also states that her friend, Rajkumar Modake ("Modake"), was behind her, saw how she fell, and provided that information to the Regal manager. (ECF No. 20 ¶ 60; Defs.' Response to SAMF ¶ 60; ECF No. 20-16.) Ms. Kaku suffered a broken ankle in the accident, and required surgery to install a rod and screws. (ECF No. 20 ¶ 56; Defs.' Response to SAMF ¶ 56.)

Before Ms. Kaku's fall, her husband and daughter had descended the same stairs without incident. (Defs.' SMF ¶ 8; ECF No. 20 ¶ 8.) Mr. Kaku had exited the theater to retrieve the family vehicle and therefore did not witness Ms. Kaku's fall. (Defs.' SMF ¶ 9; ECF No. 20 ¶ 9.) Neither Ms. Kaku nor Mr. Kaku, nor anyone else in their group, took pictures of the stairs after the fall. (Defs.' SMF ¶¶ 11, 15; ECF No. 20 ¶¶ 11, 15.) Mr. Kaku did not notice anything wrong with the stairs the evening of Ms. Kaku's fall, and he "did not talk anything about stairs" when speaking with Regal Downington's assistant manager, Erik Hoffman ("Hoffman"), that night. (Defs.' SMF ¶¶ 16–17; ECF No. 20 ¶¶ 16–17.)

The incident report created by Hoffman on December 28, 2022 ("Regal Incident Report") states "[t]he guest took an odd step off one of the steps and her foot was caught on the rubber end piece of the stair. This resulted in the guest twisting her leg as she fell back on the staircase." (ECF No. 20-5 at 2.) Hoffman testified that he inspected the stairs for tripping hazards as part of his

incident investigation that night and found none. (Defs.' SMF ¶ 21; ECF No. 20 ¶ 21.) Hoffman further testified that the day after the accident, he inspected the IMAX auditorium stairs with Defendant Gary Dailey ("Dailey"), general manager of Regal Downington, and neither found any defect that could have been the cause of Plaintiff's alleged accident. (Defs.' SMF ¶ 26–27; ECF No. 20 ¶¶ 26–27; ECF No. 15-2 at 4; ECF No. 15-5 at 6.) Dailey testified that he checked the rubber edge of each step, referred to as the "nose molding," during this inspection and "didn't notice[] that [it] was loose or could have caused a fall." (ECF No. 15-2 at 7.) During this inspection, Dailey took pictures of the steps where Ms. Kaku allegedly fell. (ECF No. 15-5 at 6; ECF No. 20 ¶ 62; Defs.' Response to SAMF ¶ 62; ECF No. 20-10.)

Regal's management team performs daily inspections of the Regal Downington building, typically at the beginning of each day. (Defs.' SMF ¶ 30; ECF No. 20 ¶ 30.) Dailey testified that the daily inspection includes a review of the stairways in each auditorium, including walking up and down the stairs, to identify potential hazards. (Defs.' SMF ¶ 31; ECF No. 20 ¶ 31.) Dailey did not find any defect with the IMAX auditorium stairs when performing the daily inspection on December 27, 2022. (Defs.' SMF ¶ 32; ECF No. 20 ¶ 32.) Per the inspection sheet for December 27, 2022, no defect was found regarding any staircase, including the IMAX auditorium staircase where Ms. Kaku fell. (Defs.' SMF ¶ 34; ECF No. 20 ¶ 34.) Dailey testified that during his twenty-seven-year career with Regal[2], to his knowledge there have been no other accidents on theater steps. (ECF No. 15-2 at 10; Defs.' SMF ¶ 41; ECF No. 20 ¶ 41.) He also testified that he never noticed any problems with the nose moldings in any of the theaters or sought to repair or replace

[2] Before joining Regal Downington in April 2021, Dailey worked at several Regal theater locations in New Jersey and South Philadelphia. (ECF No. 15-2 at 4.)

any nose moldings at any time during his career at Regal, including those near where Ms. Kaku fell. (ECF No. 20 ¶¶ 74–75; Defs.' Response to SAMF ¶¶ 74–75.)

### B. Procedural Background

Plaintiffs filed their Complaint in the Court of Common Pleas of Philadelphia County, Pennsylvania on October 23, 2024, asserting eight counts of negligence against Regal, Dailey, Ashley Mansfield, and three John Doe Defendants, and one count of loss of consortium brought by Mr. Kaku against all Defendants. (*See generally* ECF No. 1-1.) On January 29, 2025, Defendants removed the action to this Court based on diversity jurisdiction. (ECF No. 1 at 4, 9.) Plaintiffs' claims against Defendant Ashley Mansfield were dismissed with prejudice by stipulation. (ECF No. 6.) On February 17, 2026, Defendants moved for summary judgment (ECF No. 15) and to exclude the opinions of Plaintiffs' expert, David Littlewood (ECF No. 16). On March 17, 2026, following further briefing by both parties, Plaintiffs filed a motion for leave to file surreply regarding the motion to exclude. (ECF No. 19.) The motions are now fully briefed and ripe for disposition.

## II. MOTION TO EXCLUDE DAVID LITTLEWOOD

Plaintiffs rely on their expert, David Littlewood ("Littlewood"), throughout their summary judgment briefing to assert that the stairway at the Regal Downington presented a trip and fall hazard in 2022 due to cracks and separations in the rubber nose molding on the edge of the individual steps, and that this hazard caused Ms. Kaku's fall and injuries. The Court therefore addresses the motion to exclude Littlewood before addressing the summary judgment motion.

In his expert report, Littlewood opines that the cracks and separations in the nose moldings created a vertical change in elevation that was not reasonably expected and difficult to observe; Defendants knew or should have known that this defect in the nose molding presented a fall hazard

for customers; Defendants should have but failed to provide reasonable inspections that would have identified the hazard; Defendants failed to repair the nose molding and eliminate the fall hazard; and Defendants' failure to inspect and maintain the stairs in compliance with applicable codes caused Ms. Kaku's fall. (ECF No. 15-8.)

### A. Motion for Leave to File Surreply

The Court first addresses Plaintiffs' Motion for Leave to File Surreply regarding the Motion to Exclude. Plaintiffs filed a Motion for Leave to File Surreply (ECF No. 19), which Defendants oppose (ECF No. 21). Attached to the surreply is an affidavit dated March 16, 2026, from Littlewood explaining that in addition to the photos he personally took during his site inspections in 2025, he also considered a photo of the stairs taken by Dailey in December 2022 (produced by Defendants during discovery) and a photo taken in August 2023 (produced by Plaintiffs during discovery). (ECF No. 19-4 ¶¶ 5, 7.) Littlewood asserts that these photos show the same cracks in the nose molding that he observed during his own inspection of the stairs in 2025. (*Id.* ¶¶ 6, 7.) Defendants contend that granting the Motion for Leave to File Surreply will allow Plaintiffs to address arguments that Defendants raised in their original Motion to Exclude (rather than any new issues raised in Defendants' Reply) and present new opinions from Littlewood. (ECF No. 21 at 7.) Though not explicitly stated, Defendants suggest that the Court should exclude Littlewood's "new 'methodology'" as presented in the surreply for failure to comply with Federal Rule of Civil Procedure 26. (ECF No. 21 at 6 ("A district court can properly preclude 'new' expert testimony that was not included in the original expert report.") (citing *Rhoads Indus., Inc. v. Shoreline Found., Inc.*, Civil Action No. 15-921, 2021 WL 2778562, at *21 (E.D. Pa. July 2, 2021) (excluding expert testimony regarding analysis of data where the analysis was incomplete at the

time of the expert's deposition and no supplement to the expert report was made as required under Fed. R. Civ. P. 26(a) or (e))).)

Rule 26(a) requires that the disclosure of expert testimony "be accompanied by a written report" including "a complete statement of all opinions the witness will express and the basis and reasons for them" and "the facts or data considered by the witness in forming them." Fed. R. Civ. P. 26(a)(2)(B)(i)–(ii). "The parties must supplement these disclosures when required under Rule 26(e)." Fed. R. Civ. P. 26(a)(2)(E). Rule 26(e) in turn provides that for an expert whose report is disclosed in accordance with Rule 26(a)(2)(B), "the party's duty to supplement extends both to information included in the report and to information given during the expert's deposition." Fed. R. Civ. P. 26(e)(2). If a party fails to meet its obligations under Rule 26, the party "is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). When deciding whether to exclude evidence under Rule 37, courts have applied factors enumerated by the Third Circuit:

> (1) [T]he prejudice or surprise in fact of the party against whom the excluded witnesses would have testified or the excluded evidence would have been offered; (2) the ability of that party to cure the prejudice; (3) the extent to which allowing such witnesses or evidence would disrupt the orderly and efficient trial of the case or of other cases in the court; (4) any bad faith or willfulness in failing to comply with the court's order; and (5) the importance of the excluded evidence.

*See Rhoads Indus., Inc.*, 2021 WL 2778562, at *19 (citing *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 298 (3d. Cir. 2012)).

In their Reply in Support of the Motion for Leave to File Surreply, Plaintiffs characterize the information in Littlewood's affidavit as "only not[ing] an additional piece of evidence that supports the same opinion he gave in his expert report" (ECF No. 23 at 3), but also refer to that same information as an "additional opinion" and a "late opinion" (*id.* at 4). Putting aside these

inconsistencies in Plaintiffs' language, in reviewing the affidavit the Court finds that Littlewood's ultimate opinions—that the defects in the nose molding existed in 2022 and caused Ms. Kaku's fall at that time—remain unchanged. As such, Littlewood's affidavit does not present new opinions, but rather gives more information regarding the basis for the opinions he previously expressed.

The Court finds that the exclusion of the evidence contained in Littlewood's affidavit is not warranted under Rule 37. *Konstantopoulos v. Westvaco Corp.*, 112 F.3d 710, 719 (3d Cir. 1997) (noting that the exclusion of critical expert testimony is an extreme sanction). Here, the photos Littlewood references in the affidavit are not new or surprising to Defendants since they were produced during discovery, including by Defendants. Moreover, any prejudice to Defendants caused by allowing this evidence is minimal and easily cured. While Defendants may not have been able to ask Littlewood about his methodology in comparing these photos during his initial deposition, Plaintiffs have indicated that they would stipulate to Defendants filing a supplemental rebuttal report before trial. (ECF No. 23 at 3–4.) A trial date has not yet been set, so no existing court calendar would be affected by a rebuttal report. Additionally, Defendants point to no bad faith or willfulness on the part of Plaintiffs that caused the delayed disclosure of this information. Finally, the evidence is important to the Court's determination of whether Littlewood's expert testimony reflects a reliable methodology. The Court will therefore grant the Motion for Leave to File Surreply and consider the information contained in Littlewood's affidavit when deciding the Motion to Exclude.[3]

---

[3] To the extent Defendants ask the Court to exercise its discretion to deny the Motion for Leave to File Surreply as outlined in the Court's Policies and Procedures, the Court declines to do so.

### B. Legal Standard

Under Federal Rule of Evidence 702, a proponent of expert witness testimony must demonstrate to the court that it is more likely than not that: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702.

Rule 702 tasks the Court with a "rigorous gatekeeping function." *Cohen v. Cohen*, 125 F.4th 454, 460 (3d Cir. 2025) (quoting *Elcock v. Kmart Corp.*, 233 F.3d 734, 744 (3d Cir. 2000)). The December 1, 2023 amendment to Rule 702 served to "clarify and emphasize that expert testimony may not be admitted unless the proponent demonstrates to the court that it is more likely than not that the proffered testimony meets the admissibility requirements set forth in the rule." Fed. R. Evid. 702 Advisory Committee Notes, 2023 Amendments. The Advisory Committee Notes further state that "many courts have held that the critical questions of the sufficiency of an expert's basis, and the application of the expert's methodology, are questions of weight and not admissibility," which is an "incorrect application" of the Rule. *Id.*

The Third Circuit has said that Rule 702 "embodies three distinct substantive restrictions on the admission of expert testimony: qualifications, reliability, and fit." *Elcock*, 233 F.3d at 741. To be qualified under Rule 702, the proffered witness must have specialized knowledge, which "can be practical experience as well as academic training and credentials," and "at a minimum, a proffered expert witness . . . must possess skill or knowledge greater than the average layman." *Id.* (quoting *Waldorf v. Shuta*, 142 F.3d 601, 625 (3d Cir. 1998)).

An expert is reliable when their opinions "reliably flow from the facts known to the expert and the methodology used." *Oddi v. Ford Motor Co.*, 234 F.3d 136, 146 (3d Cir. 2000) (quoting *Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 153 (3d Cir. 1999)); *see also Hoefling v. U.S. Smokeless Tobacco Co.*, 576 F. Supp. 3d 262, 271 (E.D. Pa. 2021) (reliability analyzes "the methodology, the facts underlying the expert's opinion, and the link between the facts and the conclusion" (internal quotations omitted)). The focus of reliability is "on principles and methodology, not on the conclusions that they generate." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 595 (1993). "[T]he expert must have 'good grounds' for his or her belief." *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 742 (3d Cir. 1994). In evaluating reliability, the Court should consider:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

*De La Cruz v. V.I. Water & Power Auth.*, 597 F. App'x 83, 91 (3d Cir. 2014) (quoting *Elcock*, 233 F.3d at 745–46). Where the expert employs "a non-scientific method," the Court should consider these factors "where they are reasonable measures of the reliability of expert testimony." *Elcock*, 233 F.3d at 746 (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)).

Lastly, an expert is fit when their testimony assists the trier of fact. *Paoli R.R.*, 35 F.3d at 742–43. Fit requires a connection between the methodology and the factual issues in the case. *Id.* "[E]ven if an expert's proposed testimony constitutes scientific knowledge, his or her testimony will be excluded if it is not scientific knowledge *for purposes of the case*." *Id.* at 743. Fit primarily goes to relevance. *Karlo v. Pittsburgh Glass Works, LLC*, 849 F.3d 61, 81 (3d Cir. 2017).

**C. Qualification**

Littlewood has a Bachelor of Science and Master of Science in Civil Engineering from Villanova University, and is licensed as a professional engineer in Pennsylvania, Delaware, and New Jersey. (ECF No. 17-10 at 2.) He currently works at Fleisher Forensics, where his expertise includes premises liability, walkway surfaces, and code and safety compliance regarding walkways and stairways. (*Id.*) Defendants do not suggest that Littlewood is not qualified to serve as an expert in this case. Given these facts, the Court concludes that Littlewood meets the qualification requirement under Rule 702. *See Elcock*, 233 F.3d at 741.

**D. Reliability**

Defendants argue that Littlewood's conclusion that the cracks in the nose molding he identified in 2025 existed at the time of Ms. Kaku's fall in 2022 does not reflect the application of a reliable methodology. (ECF No. 16 at 11; *id* at 12 (citing *Furlan v. Schindler Elevator Corp.*, 516 F. App'x 201, 206 (3d Cir. 2013) (upholding district court's exclusion of plaintiff's expert for failing to demonstrate a reliable methodology for his opinion)).) Specifically, Defendants assert that Littlewood's conclusion is based solely on his inspection of the Regal Downington steps in 2025, without any scientific modeling or analysis to explain how he concludes that the defects he observed in 2025 were present three years prior. (*Id.* at 13; ECF No. 18 at 2–3.) Furthermore, Defendants contend that Littlewood provides no biomechanical analysis in support of his conclusion that the nose moldings caused Ms. Kaku's fall. (ECF No. 16 at 13; ECF No. 18 at 3.)

Plaintiffs respond that Littlewood provides "[r]eliable [s]pecialized [k]nowledge" based on measurements of the accident scene and analysis of relevant safety codes. (ECF No. 17-1 at 10.) In their surreply, Plaintiffs clarify that, in addition to his own inspection of the stairs in June 2025,

Littlewood's opinions are based on his review of photos taken by Dailey in December 2022 and a photo of the steps from August 2023. (ECF No. 19-3 at 2.)

The Court finds that Littlewood only applied a methodology to identify a fall hazard in 2025. Littlewood personally inspected the stairs in 2025 and determined, based on his measurements of the vertical change in elevation and reference to applicable building codes, that the stairs *at that time* presented a fall hazard. (ECF No. 17-13 at 17 ("The subject stairway, due to its cracked and separated nosing covers resulting in a vertical change in elevation of more than ¼ inch, violated the adopted International Property Maintenance Code/2021 and the International Fire Code/2021, as discussed in this report.").) To determine that the vertical change in elevation was more than ¼ inch, Littlewood "got on his hands and knees to check if the nose moldings were properly adhered to the stairs and determined that 'the cracked portions were not adhered at all.'" (ECF No. 17-1 at 7; ECF No. 17-12 at 7–8.) He then "pushed on the step with his thumb to feel how the step would compress when pressure was applied" using only "minimal pressure." (ECF No. 17-1 at 7; ECF No. 17-12 at 9–10.)

But Plaintiffs have failed to state any scientific methodology upon which Littlewood relied to conclude that the fall hazard he observed in 2025 was present in 2022. Littlewood's expert report does not explain what methodology he applied to conclude that the same defects in the nose molding were present at the time of Ms. Kaku's fall. Only on surreply do Plaintiffs present an affidavit from Littlewood explaining that he reviewed a photo of the steps taken in December 2022, which he asserts "shows lines in [the] upper black portion of the nose molding that appear to be consistent with the cracks [he] identified during [his] inspection." (ECF No. 19-4 ¶ 7.) In the affidavit, Littlewood also asserts that a photo taken August 2, 2023 "shows the same cracks [he] identified during [his] inspection" in 2025. (*Id.* ¶ 6.) Yet Littlewood provides no scientific

assessment of how the cracks he purports to observe in the earlier pictures present the same fall risk he identified in 2025. For example, he does not point to any details in the photos he used to identify the width or height of any apparent crack, such that he is able to determine the change in elevation. Rather, Littlewood's opinion that the condition of the stairs in 2025 is the same as that Ms. Kaku encountered in 2022 is based solely on his basic review of two photos, including one where he readily admits that "[t]he quality of the photo is poor." (*Id.* ¶ 7.)

Furthermore, even if the Court were to assume that the cracks in the nose molding that Littlewood observed in 2025 did exist in 2022 as Plaintiffs assert, Littlewood fails to state any reliable principles or methodologies underlying his opinion that those cracks were the cause of Ms. Kaku's fall. Moreover, the Court will not engage in assumptions. Littlewood opines that Regal's failure to maintain the stairs free of fall hazards "caused Latika Kaku to fall." (ECF No. 17-13 at 17.) Yet he provides no analysis connecting his prior application of "minimal pressure" to the pressure that Ms. Kaku's foot would have placed on the nose molding, examining the average person's gait in relation to the stairs, explaining how Ms. Kaku's fall is consistent with the obstruction that he opines were created by the cracks, or any other investigation. Indeed, Littlewood apparently bases his opinion regarding causation on his conclusion that there was a fall hazard and the fact that Ms. Kaku fell. An expert cannot be reliable when relying solely on the ipse dixit of the expert. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997); *see also In re Zostavax (Zoster Vaccine Live) Prods. Liab. Litig.*, 579 F. Supp. 3d 675, 679 (E.D. Pa. 2021) ("[T]he ipse dixit of the expert as the only connection to the underlying data is insufficient to establish reliability.").

The cases Plaintiffs cite in support of Littlewood's reliability are inapplicable. In *Gransinger v. Caterpillar, Inc.*, the court denied a motion to exclude because the experts utilized

a methodology accepted in their field when analyzing photos of a defective tool rather than inspecting the physical tool itself. Civil Action No. 21-956, 2023 WL 4846843, at *10 (W.D. Pa. July 28, 2023). But those experts "conducted a macroscopic evaluation of the available photographs of the spike tooth; identified significant, visual markers (i.e., the flat surface at the point of breakage and the formation of a cantilever curl); and interpreted their observations based on the ASM Handbook." *Id.* In contrast, Littlewood's review of the photos as discussed in the affidavit lacks any reference to established methodologies or any indication of the same rigorous review. Similarly, the court's reasoning in *Slappy-Sutton v. Speedway LLC* does not help Plaintiffs' argument. Civil Action No. 16-4765, 2019 WL 3456843, at *3 (E.D. Pa. July 31, 2019). Unlike here, that case gives no indication that the defendants argued that the conditions at the scene of the accident inspected by the expert were different than those encountered by the plaintiff when they fell.

For the reasons stated above, the Court finds that Littlewood's opinions that the nose moldings were cracked and separated in 2022 and that this defect caused Ms. Kaku's fall at that time, fail to meet the reliability requirement.

**E. Fit**

Defendants assert that Littlewood's opinions do not flow from the facts known to him and would not assist the trier of fact. (ECF No. 16 at 14.) They also argue that, to the extent Littlewood's proposed methodology is "simply comparing photos, not engineering analysis," he would only provide lay opinion testimony that does not meet the requirements of Rule 702. (ECF No. 21 at 8.) In response, Plaintiffs contend that Littlewood's opinions that the nose molding was cracked and separated in 2022 and that this condition caused Ms. Kaku's fall are supported by evidence in the record. (ECF No. 17-1 at 13–16.) Specifically, Plaintiffs assert that Ms. Kaku's

testimony and the Regal Incident Report indicate that Ms. Kaku's "foot was caught on the rubber end piece of the stair," which caused her ankle to twist and break. (*Id.* at 12, 14.) Plaintiffs further state that Littlewood "is able to show how he scientifically measured and documented the defect he observed and point to direct evidence that the same cracks he documented were present at the time of the accident." (ECF No. 19-3 at 4.)

As noted above, fit requires a connection between the methodology and the factual issues in the case. *Paoli R.R.*, 35 F.3d at 742–43. Therefore, the requirement of reliability "extends to each step in an expert's analysis all the way through the step that connects the work of the expert to the particular case." *Id.* at 743. Here, even if Littlewood has applied a reliable methodology to support his opinion that the nose molding created a fall hazard in 2025, he has failed to connect this to the question on which he is asked to opine: the condition of the stairs in 2022 and its effect, if any, on Ms. Kaku's fall. Plaintiffs acknowledge that an explanation of "the hazard caused [by] the cracked stair protector and how long it had been there[] is a *technical engineering question*." (ECF No. 23 at 7 (emphasis added); *see also id.* (arguing that Littlewood's testimony is essential to explain "the significance of the cracks" observed in the 2022 and 2023 photos).) Yet nothing in Littlewood's expert report or the affidavit submitted on surreply provides an analysis based in Littlewood's engineering background—or any reliable methodology—to explain how the cracks in the earlier photos are similar in degree to the hazard that he observed in 2025. For instance, he does not apply his engineering background to identify marks in the earlier images that indicate the same amount of change in elevation; he also does not explain why the cracks he observed in 2025 could not simply result from normal wear and tear in a regularly trafficked, publicly utilized space over the two-year period since the most recent photos were taken. In essence, Littlewood's affidavit amounts to an assertion that the photos from 2022 and 2023 look similar to what he

documented in his photos in 2025. Thus, his opinions are derived from his basic review of the photos without any specialized analysis. There is no reason to believe that a lay juror is incapable of the same analysis. The Court therefore finds that Plaintiffs have failed to demonstrate that Littlewood's opinions regarding the condition of the stairs in 2022 and the cause of Ms. Kaku's fall would "assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. Accordingly, Plaintiffs fail to meet the fit requirement by a preponderance of the evidence.

### F. Exclusion of Expert Testimony

For the reasons explained above, Littlewood's expert opinions are excluded as to the condition of the stairs in 2022 and the cause of Ms. Kaku's fall.

## III. MOTION FOR SUMMARY JUDGMENT[4]

### A. Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict

---

[4] Plaintiffs ask the Court to deny Defendants' Motion for Summary Judgment because Defendants failed to comply with the Court's Policies and Procedures requiring the moving party to contact opposing counsel at least seven days prior to filing a summary judgment motion. (ECF No. 20-1 at 1; ECF No. 20 ¶¶ 49–55.) Defendants' counsel emailed Plaintiffs' counsel the day before filing the motion, stating "[Defendants] will be filing a Motion for Summary Judgment, as well as a Rule 702 Motion to Preclude David Littlewood." (ECF No. 20-13 at 2; ECF No. 20 ¶ 51; Defs.' Response to SAMF ¶ 51.) Defendants' counsel called Plaintiffs' counsel regarding the same shortly thereafter. (ECF No. 20 ¶¶ 52–53; Defs.' Response to SAMF ¶¶ 52–53.) Defendants suggest that Plaintiffs were on notice of Defendants' intent to file a dispositive motion given counsel's discussion in September 2025. (Defs.' Response to SAMF ¶ 50.) Regardless of any prior discussion that occurred, the Court admonishes Defendants' counsel for failure to comply with a straightforward and binding directive from the Court. However, given the posture of the case and for purposes of judicial efficiency, the Court will adjudicate the motion.

for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is "material" if it might affect the outcome of the case under governing law. *Id.*

A party seeking summary judgment bears the initial responsibility for informing the district court of the basis for its motion and identifying portions of the record that it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Where the non-movant bears the burden of proof, the movant's initial burden can be met simply by "pointing out to the district court that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. After the movant has met its initial burden, the non-movant's response must, by "citing to particular parts of materials in the record," show that a fact is "genuinely disputed." Fed. R. Civ. P. 56(c)(1). Summary judgment is appropriate if the non-movant fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. Under Rule 56, the Court must view the evidence presented in the light most favorable to the opposing party. *Anderson*, 477 U.S. at 255.

### B. Discussion

Under Pennsylvania law, a claim for negligence contains four elements:

> (1) a duty or obligation recognized by the law, requiring the actor to conform to a certain standard of conduct for the protection of others against unreasonable risks; (2) a failure to conform to the standard required; (3) a causal connection between the conduct and the resulting injury; and (4) actual loss or damage resulting in harm to the interests of another.

*Nw. Mut. Life Ins. Co. v. Babayan*, 430 F.3d 121, 139 (3d Cir. 2005). Defendants argue that Plaintiffs have failed to demonstrate (1) that a hazardous condition existed on the date of Ms. Kaku's fall; (2) that Defendants had actual or constructive notice of the defective condition; and (3) without speculation, the cause of Ms. Kaku's injury. The Court addresses each argument in turn.

**1. Duty**

Pennsylvania courts have adopted the Restatement (Second) of Torts approach to determining the duty owed by a possessor of land to a person on that land. *Felix v. GMS, Zallie Holdings, Inc.*, 827 F. Supp. 2d 430, 436 (E.D. Pa. 2011), *aff'd* 501 F. App'x 131(3d Cir. 2012) (citing *Kirschbaum v. WRGSB Assocs.*, 243 F.3d 145, 152 (3d Cir.2001)). "The standard of care a possessor of land owes to one who enters upon the land depends upon whether the person entering is a trespass[e]r, licensee, or invitee." *Carrender v. Fitterer*, 469 A.2d 120, 123 (Pa. 1983). "Possessors of land owe a duty to protect invitees from foreseeable harm." *Id.* An invitee may therefore expect that the business owner "will take reasonable care to ascertain the actual condition of the premises and, having discovered it, either to make it reasonably safe by repair or to give warning of the actual condition and the risk involved therein." *Donahue v. Wal-Mart Stores East, L.P.*, 810 F. Supp. 3d 607, 614 (W.D. Pa. 2025) (quoting Restatement (Second) of Torts § 343 (1965)).

As the owner and operator of the Regal Downington IMAX, Defendant Regal was the possessor of the land on which Ms. Kaku sustained injuries. The parties seem to agree Ms. Kaku was a business invitee at the time of her fall in the IMAX auditorium. (*See* ECF No. 15 at 13–14; ECF No. 20-1 at 4.) Thus, Regal owed a duty to protect Ms. Kaku from foreseeable harm on its property.[5]

---

[5] The Motion for Summary Judgment is filed on behalf of all Defendants, and does not address any potential differences in duty owed by Dailey given that he is not the landowner. The Complaint alleges that Dailey, like the other Defendants, "had a duty to maintain the premises in a safe manner and mitigate hazards to business invitees, to properly train and supervise employees, and implement appropriate safety measures." (ECF No. 1 ¶¶ 21, 25, 32, 36.) Plaintiffs' opposition to the motion does not suggest that Dailey's duty should be assessed separately. Rather, Plaintiffs' opposition addresses Defendants as a whole. The Court therefore assesses duty as to all Defendants collectively, with the understanding that Dailey's role in maintaining the premises was primarily tied to his inspections of the premises.

Defendants nevertheless argue that Plaintiffs have failed to create a genuine dispute of material fact as to the existence of a hazardous condition in the IMAX auditorium in 2022 that Defendants had a duty to make safe or warn Ms. Kaku about. Defendants note that no other patrons had issues ascending or descending the stairs. (ECF No. 15 at 15.) Defendants also point to contemporaneous inspections performed by Dailey and Hoffman, as well as their deposition testimony, to assert that no defect was identified by Regal staff. (*Id.*) Additionally, Defendants assert that Littlewood's conclusions that the defect in the nose molding existed in 2022 may not be used to create a genuine dispute of material fact. (*Id.* at 17.)

The Court finds that there is a genuine dispute of material fact as to whether the hazardous condition existed in 2022. As Plaintiffs note, the Regal Incident Report states that Ms. Kaku's "foot was caught on the rubber end piece of the stair," which "resulted in [Ms. Kaku] twisting her leg as she fell back on the staircase." (ECF No. 20 ¶ 10; ECF No. 20-5.) As Ms. Kaku attested in her sworn affidavit, Mr. Modake—who is listed as a "[w]itness" on the Regal Incident Report—was walking behind Ms. Kaku, witnessed the accident, and told Mr. Kaku "immediately after the incident that 'her foot got caught on the step and then she fell down.'" (ECF No. 20 ¶ 60; Defs.' Response to SAMF ¶ 60; No. 20-1 at 6–7; ECF No. 20-5 at 3; ECF No. 20-16.) Additionally, while the Court has excluded Littlewood's opinion that the nose molding was cracked in 2022, Littlewood may still provide testimony regarding the condition of the stairs in 2025. A reasonable jury could determine, based on Littlewood's inspection of the stairs in 2025, Dailey's testimony regarding the unchanged condition of the stairs since 2022, and other facts in evidence, that the hazardous defect was present at the time of Ms. Kaku's fall. Furthermore, the parties dispute whether Dailey's statement that the stairs in June 2025 were "in the same condition" as they were

on the day of Ms. Kaku's fall is an admission that the nose molding defects were present in 2022. (ECF No. 15 at 16; ECF No. 20-1 at 12.)

As a result, a genuine issue of material fact remains as to the existence of a hazardous defect for which Defendants had a duty to repair or warn Plaintiffs about.

**2. Actual or Constructive Notice**

"[T]he mere existence of a harmful condition or the mere happening of an accident is not evidence of a breach of a duty of care nor does it create a presumption of negligence." *Donahue*, 810 F. Supp. 3d at 614 (citing *Rodriguez v. Kravco Simon Co.*, 111 A.3d 1191, 1193 (Pa. Super. Ct. 2015)). Rather, a possessor of land owes a duty to a business invitee only when the possessor "knows or by the exercise of reasonable care would discover the condition, and should realize that it involves an unreasonable risk of harm to such invitee." *Felix*, 827 F. Supp. at 436 (quoting Restatement (Second) of Torts § 343). "In other words, the possessor of the land must have actual or constructive notice of the dangerous condition." *Id.* (citation modified) (quoting *Estate of Swift v. Ne. Hosp. of Phila.*, 690 A.2d 719, 723 (Pa. Super. Ct. 1997)). "A plaintiff's burden of proving knowledge or notice of the dangerous condition is a heavy one." *Donahue*, 810 F. Supp. 3d at 614 (quoting *Marshall v. Brown's IA, LLC*, 213 A.3d 263, 270 (Pa. Super. Ct. 2019)).

Defendants did not have actual notice of the hazardous condition. A plaintiff may demonstrate actual notice by showing that the business owner "was warned about the condition, or that the condition is one which the owner knows has recurred frequently." *Donahue*, 810 F. Supp. 3d at 614 (citing *Myers v. Penn Traffic Co.*, 606 A.2d 926, 929 (Pa. Super. Ct. 1992)). Plaintiffs do not assert, and the record does not reflect, that Defendants had actual notice of the hazardous condition. To the contrary, the parties agree that the Regal management team's morning inspection identified no hazards on the IMAX stairs, and none of the other 405 patrons had issues

traversing those stairs the day of Ms. Kaku's fall. (Defs.' SMF ¶¶ 32, 34, 38–39; ECF No. 20 ¶¶ 32, 34, 38–39.) Moreover, Dailey testified that during his twenty-seven-year Regal career, there have been no other reported accidents on theater steps and he never noticed any problems with the nose moldings. (ECF No. 15-2 at 10; Defs.' SMF ¶¶ 41; ECF No. 20 ¶¶ 41, 74–75; Defs.' Response to SAMF ¶¶ 74–75.) Thus, there is no indication that Defendants had actual notice of a hazardous condition.

Courts rely on several factors to determine constructive notice, including "the number of persons using the premises, the frequency of such use, the nature of the defect, its location on the premises, its probable cause, and the opportunity which defendant, as a reasonably prudent person, had to remedy it." *Felix*, 827 F. Supp. 2d at 437 (quoting *Hagan v. Caldor Dep't Stores, Inc.*, No. 89–7810, 1991 WL 8429, at *4 (E.D. Pa. Jan. 28, 1991)). "[O]ne of the most important factors to be taken into consideration is the time elapsing between the origin of the defect or hazardous condition and the accident." *Id.* (quoting *Neve v. Insalaco's,* 771 A.2d 786, 791 (Pa. Super. Ct. 2001)). "[I]f a hazard only existed for a very short period of time before causing any injury, then the possessor of the land, even by the exercise of reasonable care, would not discover the hazard, and thus would owe no duty to protect invitees from such a hazard." *Id.* Although the evaluation of these factors is typically left to the jury, where the evidence presented would require the jury to "resort to conjecture, guess or suspicion, the determination must be made by the Court." *Id.* (citation modified).

Here, Plaintiffs have failed to adduce evidence that would allow a reasonable jury, without conjecture or speculation, to find that Defendants had constructive notice of a hazardous condition. Plaintiffs have put forth no evidence demonstrating how long the purported defects in the nose molding existed prior to Ms. Kaku's fall and fail to show that Defendants would have, with

reasonable investigation, been able to identify and remedy the defect prior to the incident. In fact, the evidence before the Court indicates that regular inspections were conducted but none resulted in identification of a hazard on the stairs. (*See* Defs.' SMF ¶¶ 31; ECF No. 20 ¶ 31, 74–75; Defs.' Response to SAMF ¶¶ 74–75.) Moreover, Plaintiffs have presented no support for their argument that Regal's inspections were unreasonable beyond the assertion that the inspections were too short. (ECF No. 20-1 at 8 (citing ECF No. 20 ¶ 31) (suggesting that a reasonable jury could conclude that inspections of two to three minutes per auditorium were insufficient).) Plaintiffs do not outline what a "reasonable inspection" of the stairs would be or compare such an inspection to what Regal employees actually did on a regular basis. Plaintiffs rely only on Littlewood's conclusory opinion that "[t]he inspection and maintenance program at the Regal Downington movie theater complex was insufficient" and Regal "should have and did not provide reasonable inspections to detect tripping hazards on the stairways." (ECF No. 17-13 at 11, 17; ECF No. 20-1 at 10.) Plaintiffs then conclude:

> Mr. Littlewood's photos and Defendants' testimony establish that that Defendants have never noticed the cracked nose molding and tripping hazard which was visible at the location where Ms. Kaku's foot was caught as well as three other steps in the immediate area. If they had noticed the cracked nose molding, they should have checked to see if the broken molding was creating a tripping hazard. Therefore, a reasonable jury could conclude that the Defendants' inspections were insufficient and "did not meet the applicable standard of reasonable care."

(ECF No. 20-1 at 10.)

Plaintiffs argue that the facts in this case are similar to *Stais v. Sears-Roebuck & Co*, where the court explained that in some cases, "the nature and location of the defect, considering all of the circumstances especially including the number of persons using the premises, justifies a finding by the jury that it had existed for a sufficient length of time to amount to constructive notice." (ECF No. 20-1 at 6 (citing *Stais v. Sears-Roebuck & Co.*, 102 A.2d 204, 206 (Pa. Super. Ct. 1954)

(affirming denial of motion for new trial and judgment notwithstanding the verdict)).) The *Stais* court noted that "direct proof of defendant's knowledge is not essential to the imposition of liability where *the condition was a likely and foreseeable result* of the manner in which the premises were being maintained and used." *Stais*, 102 A.2d at 206 (emphasis added). Plaintiffs argue that because cracked nose moldings were present in 2025, a reasonable jury could conclude that the hazards "were a common and long-term problem which is likely and foreseeable to occur." (ECF No. 20-1 at 10.) Essentially, Plaintiffs argue that if a defect existed in 2025, it was likely and foreseeable to have existed in 2022. Plaintiffs cite no support for this argument, and the Court is not convinced.

In summary, to find constructive notice, Plaintiffs would ask the jury to speculate that (1) the cracked nose moldings that Littlewood observed in 2025 were present to the same degree in 2022, and Defendants should have known that they were a likely and foreseeable hazard; (2) Defendants did not notice the defect because their inspections were unreasonable; and (3) Defendants' inspections were unreasonable *because* they did not notice the defect. The Court cannot direct  a jury to make a decision with the absence of a record. Because Plaintiffs fail to demonstrate that Defendants had actual or constructive notice of the fall hazard, they have failed to demonstrate that Defendants had any duty to them. As a result, the Court cannot reach the issue of whether any duty was breached.

**3. Res Ipsa Loquitor**

Alternatively, Plaintiffs argue that their case may be proven by res ipsa loquitur. The doctrine may apply where a patron suffers an injury in a business from a defect "that compromises the safety of the building itself." *Neve*, 771 A.2d at 790. Under res ipsa loquitor, negligence may be inferred to be the cause of a plaintiff's harm where: (1) "the event is of a kind which ordinarily does not occur in the absence of negligence"; (2) "other responsible causes, including the conduct

of the plaintiff and third persons, are sufficiently eliminated by the evidence"; and (3) "the indicated negligence is within the scope of the defendant's duty to the plaintiff." *Id.* at 792.

Plaintiffs assert that Ms. Kaku was looking where she was going when descending the steps in a lit theater, with nothing in her hands, and while wearing sneakers and holding the railing. (ECF No. 20-1 at 14; ECF No. 20 ¶¶ 7, 57–58.) Ms. Kaku also had not consumed any substances that would affect her walking. (ECF No. 20 ¶ 57.) Plaintiffs maintain that "[a] person would not normally fall under these circumstances absent some other cause," and conclude that the cause must have been the defective nose molding. (ECF No. 20-1 at 14.)

In response, Defendants contend that human experience and the case law contradict Plaintiffs' claim that a person descending the stairs would not ordinarily fall unless someone was negligent. (ECF No. 22 at 8.) The Court agrees. The Third Circuit has explained that "a fall or misstep, without more, is not sufficient to warrant an inference of negligence under res ipsa loquitur." *Chapman v. Chaon*, 619 F. App'x 185, 188 (3d Cir. 2015); *see also* Restatement (Second) of Torts § 328D cmt. c (1965) ("The fact that a tire blows out, or that a man falls down stairs is not, in the absence of anything more, enough to permit the conclusion that there was negligence in inspecting the tire, or in the construction of the stairs, because it is common human experience that such events all too frequently occur without such negligence."). Ms. Kaku's fall was unexpected and unfortunate, but that does not by itself indicate that it was the fault of Defendants. The doctrine of res ipsa loquitur therefore does not salvage Plaintiffs' claims.

## IV. Conclusion

For the reasons explained above, Littlewood's expert testimony regarding the condition of the stairs in 2022 and the cause of Ms. Kaku's fall at that time is excluded. Because Plaintiffs fail to raise a genuine issue of material fact that would not require the jury to resort to speculation as

to whether Defendants' owed a duty to Plaintiffs, Defendants' motion for summary judgment is granted.[6] An appropriate Order follows.

**BY THE COURT:**

**/s/ Hon. Kelley B. Hodge**

**HODGE, KELLEY B., J.**

[6] Because Mr. Kaku's loss of consortium claim (Court IX) is entirely dependent on the success of Ms. Kaku's negligence claims, the Court grants summary judgment as to that claim without further inquiry. *See Perloff v. Transamerica Life Ins. Co.*, 393 F. Supp. 3d 404, 411–12 (E.D. Pa. 2019) ("Loss of consortium claims are derivative in nature and will be dismissed where the underlying claims do not survive."); *Bellinger v. Phila. Kroc Ctr.*, No. 2:25-cv-02447, 2026 WL 622856, at *5 (E.D. Pa. Mar. 5, 2026) (dismissing husband's loss of consortium claim where summary judgment was granted on wife's negligence claim).